FILED
2005 Mar-31 AM 09:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>DIVISION</u>

| | | |
|---|---|---|
| WALTER HALL | ) | |
| | ) | |
| v. | ) | CV. NO. 00-CO-8037-E |
| | ) | CR. NO. 98-CO-209-E |
| UNITED STATES OF AMERICA | ) | |

<u>MEMORANDUM OF DECISION</u>

Walter Dean Hall was convicted of one count of possession within intent to distribute crack cocaine in violation of 18 U.S.C. § 841(a)(1) and received a 235 month sentence. His conviction and sentence were affirmed on appeal. (Doc. #60). In his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Hall raises thirteen claims.

I.   <u>Whether the magistrate judge erred in denying the motion to suppress</u>

This issue was addressed by the Eleventh Circuit Court of Appeals on direct appeal:

> The district court did not err by denying Hall's or Kirksey's motions to suppress evidence because probable cause to search the automobile arose when officers saw them returning from Atlanta to Alabama in the described vehicle. The officers had received anonymous telephone tips about the upcoming activity of Kirksey and Hall. From observing Kirksey drive to Atlanta, pick up Hall and drive back to Atlanta, the officers had sufficient corroboration of this information. At that time, probable cause and exigent circumstances existed to search the vehicle.

This issue was decided adversely to Mr. Hall on appeal. It may not be reconsidered here in the absence of a showing of actual innocence. *Davis v. United States*, 417 U.S. 333 (1974). Hall may obtain collateral review only if he satisfies the fundamental miscarriage of justice exception. That exception has been described as "an extraordinary case where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496

(1986). In *Schlup v. Delo*, 513 U.S. 298, 324 (1995), the Supreme Court stated that such a claim of actual innocence "requires petitioner to support his allegation of constitutional error with new reliable evidence ... that was not presented at trial."

Hall notes Ms. Kirksey's trial testimony in which she stated that the drugs were hers and the alleged jealousy of his ex-wife and his Kirksey's boyfriend as evidence of his actual innocence. The jury, however, heard trial testimony and considered and the testimony of Ms. Kirksey and Hall which insinuated that the anonymous tips were motivated by the jealousy of Hall's ex-wife and Ms. Kirksey's boyfriend against Hall when they allegedly knew that the drugs actually belonged to Ms. Kirksey. The jury simply did not find the trial testimony of Ms. Kirksey and Hall that the drugs were Ms. Kirksey's to be credible. There is no evidence of actual innocence.

II.     Whether the trial judge prejudiced the outcome of
        the case by declining to call juror Marie Heath

Juror Marie Heath did not respond to the question asking if any of the jurors had heard of Mr. Ritchey, Hall, or other potential witnesses. Hall maintains that Bessie Hall and Daphne Kirksey, both of whom had been listed as potential witnesses, knew Marie Heath and she should have known them. While the trial judge decided not to question Ms. Heath and "run the risk of creating a problem with Ms. Heath," (R-64-65) he did question both Mrs. Hall and Ms. Kirksey concerning their knowledge of Ms. Heath. Mrs. Hall testified that she did not "know [Ms. Heath] personally," that "she used to come to the Elks Lodge where I was a member of," that she had not talked with her "no more than to speak," that Ms. Heath might know her [Mrs. Hall's] name, that she [Mrs. Hall] had last been in Ms. Heath's presence five of six years before, and that Ms. Heath had not acknowledged Mrs. Hall that morning in court. (R-66-67). Mrs. Hall further testified that she had worked at the Elks Lodge

2

as a waitress. She stated that Ms. Heath might have known her name, but that they never talked extensively to each other. (R-68). Mrs. Hall summarized her knowledge of Ms. Heath:

> I don't know her personally. She used to come to this club and I used to work there. I would speak, or maybe she would speak. ... [T]hat's as far as the conversation would go.

(R-68).

Ms. Kirksey testified that she and Ms. Heath had dated the same man about fifteen or twenty years previously. (R-69, 74). She testified that she recognized Ms. Heath and that Heath should recognize Ms. Kirksey's last name, (R-71); that they had never spoken extensively at any time, (R-71), that she [Ms. Kirksey] had been a waitress at the Elks Lodge and that Ms. Heath used to come in every weekend. (R-71-72). Upon questioning by the court, Ms. Kirksey explained the circumstances of her knowledge of Ms. Heath:

> Well, I was going with this man. Okay. And I heard he was going with her. So she come in the club, so somebody say, that's the lady he going with. That's how I first saw her.
>
> We were not acquainted-acquainted, but that's how I saw her for the first time.

(R-75).

Although Ms. Kirksey insisted that "I know her," she admitted that she had most likely last seen Ms. Heath more that five years before the trial and that the two women had no relationship other than the "mutual acquaintance of Mr. Wills" and seeing each other at the Elks Club. They never engaged in conversation or shared a meal or drinks. (R-77-79). She testified that Ms. Heath did not indicate in the courtroom that she was aware of Ms. Kirksey. (R-80).

At the conclusion of the questioning of both Mrs. Hall and Ms. Kirksey, both the Assistant United States Attorney (Mr. Salter) and defense counsel (Mr. Ritchey) indicated that they were satisfied with continuing with Ms. Heath on the jury. (R-81). For the record, the court asked whether there was any claim that Hall knew Ms. Heath or that Ms. Heath knew Hall and was assured that there was no such claim. (R-81).

The jury had been sworn when the court was informed that Ms. Heath might know Mrs. Hall and Ms. Kirksey. (R-63). Based on the facts in the record, there was nothing to indicate that Ms. Heath was being untruthful or "deceitful" in failing to state that she knew any of the witnesses. Neither Mrs. Hall nor Ms. Kirksey had seen Ms. Heath within the previous five years, and prior to that there had been no relationship between either of them and Ms. Heath. Finally, both women testified that Ms. Heath did not indicate that she recognized them when they saw her at the courthouse. There is still no allegation that Ms. Heath knew Hall. In light of the testimony of Mrs. Hall and Ms. Kirksey that indicated that they knew who Ms. Heath was but had never had any relationship with her, the court was not required to question Ms. Heath.

III.    <u>Whether a juror and the prosecutor engaged in misconduct violating Hall's rights.</u>

Hall alleges that, in violation of the judge's instruction to the jurors that they not discuss the case among themselves or with anyone else, the prosecutor and jury foreman discussed the case while the jury was in deliberation and "petitioner believes the juror clearly informed the prosecutor that they found petitioner guilty before informing the court." (Petition, p. 6). This claim is factually without merit.

The judge instructed the jury before testimony began:

4

During the trial you must not discuss the case in any way among yourselves or with anyone else.  You must not permit anyone to discuss it in your presence or with you.

One thing about that, insofar as the lawyers are concerned and perhaps other people you will come to associate in the trial, to avoid even the appearance of some sort of impropriety, those folds tend to be very careful, and rightfully so.  They very likely will not speak to you.

As you are aware by now, we have a common lobby, public elevators, and a common lobby on this floor.  It's almost impossible that we can separate you from everybody associated with the trial at all times.  You may come through that magnetometer downstairs, one behind the other.

If the lawyers or the other people you see associated with the trial don't speak to you tomorrow morning, please don't be offended.  They're not rude.  They simply don't want somebody to see them speaking to you and think that they might be communicating something improper to you or engaging in some sort of improper communication.

After the trial is over, they'll be glad to talk to you.  I know some of these folks, and I've known some of them for a long, long time.  And so far as I know, they're all nice folks and courteous.  So, don't get upset if they don't talk to you.

(R-84).

During the jury deliberations, the judge was advised by Mr. Ritchey and Mr. Salter that there

had been a communication between the jury foreman and Mr. Salter:

MR. RITCHEY:     Let me preface this to say that we're not back here because of any complaint that I've made or will make.  But, Frank came to me this morning, awhile ago, to merely tell me that while he was in the elevator coming up with the foreman of the jury, that the foreman of the jury made a remark to him.  I'll let him tell you what the remark was.

And I think it was a – even though you had cautioned them not to speak to us and us not speak to them, I think it was just something that came out of him

5

because he loves to talk to people. But, I have no problem with it and wanted to --

MR. SALTER:        What happened, Your Honor, was this: I got on at the ground floor along with a number of people. And they began to get off – the other people – on floors two, three, and I found himself left alone with the juror on floors, I think, five through seven. <u>And he turned to me and said – smiled and said – and I'm trying to think of the exact words: This thing will probably be over by noon, won't it?</u>

<u>And I just kind of shrugged.</u> And I would have mentioned it when you first came out, but I sort of forgot about it. And then I thought about it after you'd left and mentioned it to Mr. Ritchey. And I agree with him, I don't think that he meant anything by that or anything like that, but I felt duty bound to tell him.

THE COURT:         Sure. His words were: This thing will probably be over by noon, won't it?

MR. SALTER:        Something like that. Yes, sir.

THE COURT:         Something like that. On the surface, that doesn't suggest to me a communication that suggests he's disposed to go one way or the other.

MR. SALTER:        Right. It was almost as if he was – he was referring to what – to our having to do something else, you know, the process, as opposed to referring to the length of the deliberation. But I don't know how he could have been referring to the process.

MR. RITCHEY:       My observation of him, you noticed I think he was the same man that came up and spoke to Your Honor.

THE COURT:         He was – by the way, he was asking me about – he saw Judge Blackburn's name was Sharon Lovelace Blackburn and said he knew a person – he's from Evergreen, he knew a person from Brewton named Buddy Lovelace and wanted to know whether I knew they were related. And I don't. But that's what he asked me.

MR. RITCHEY:       That's what I mean. I think he has a tendency to just want to say something. I think he probably felt on that – this is my thinking – felt on the elevator that, here I am with this man. This man has been in trial, you know, I'm going to say, hi. He could have said hi, or he could have said, well, it ought to be over by 12 o'clock.

I'm like you, I don't really see any harm in it.  I hope there wasn't any in it.  But I frankly had told him as far as I was concerned, he didn't have to bring it to your attention, but he felt obligated.

MR. SALTER:        Judge, we're assuming also he's the foreman.  We don't know that for sure.  He has been the one to come to the door, and he's got kind of a booming voice, to ask to talk to the clerk.  And we just assume he's the foreman.

THE COURT:         All right.  Why don't we do this.  I don't see any reason we need to inquire.  Unless we have a verdict before they take a break – if they take a midmorning recess, why don't we ask them to come back in and let me reiterate that they should not speak to anybody, the lawyers, or anybody associated with the case, other than Ms. Likos and communicating with her what they're doing – breaking and questions and that sort of thing – because it puts the lawyers in an awkward situation, among other things.

Why don't we do that, and perhaps try to avoid any additional reason for concern.

MR. RITCHEY:       Judge --

MR. SALTER:        Judge, can you do it in a way to talk to them and add some other things in there too, like to talk to then about the lunch break, to remind them, for example, that they can break on their own and this and that?

THE COURT:         Sure.

MR. SALTER:        Just sort of – as if it's an afterthought so they won't really focus on him and me.

THE COURT:         Sure.

MR. RITCHEY:       I have no problem with it, Judge, one way or the other now.  Whatever you think you should do, you do.  But I have no problem.  Like I told Frank, I wasn't going to make an issue and I promise the Court I won't make an issue.  I'll put it on the record, I'm not going to make an issue.

MR. SALTER:        Judge, it might not even be necessary to do it, then, if we stay away.  For example, I shouldn't have got on the elevator.  But there was so many other people on there, I thought it was all right to do it.

MR. RITCHEY:       I will tell you this morning that I waited because I saw four of them get on.  I didn't want to get on the elevator and not be able to say good morning, I

7

guess is what it boils down to.  But you can't know that somebody is going to speak to you.

THE COURT:        Why don't we just let it go, then.

MR. SALTER:       Yes, sir.

MR. RITCHEY:      That suits me.

THE COURT:        But you tell your folks on both sides to avoid any sort of contact.  Just stay away from them.

MR. SALTER:       Yes, sir.

(R-408-12).  (Emphasis added).

There is no evidence to support Hall's allegation of deceit on the part of Mr. Salter concerning the content of the conversation nor has Hall identified a right implicated had the juror's comment been construed as an indication that a verdict was imminent.  Mr. Salter's noncommittal shrug can hardly be found have to so infected the trial as to render the proceedings fundamentally unfair.[1]

There was nothing in the juror's comment to imply that the jury had found Hall guilty.  Both defense counsel and the judge recognized that the juror in question probably felt compelled to say something in the elevator.

IV.    Whether the trial judge violated Hall's due process and equal
       protection rights when he did not *sua sponte* declare a mistrial based
       on the communication between the juror and AUSA discussed above

There is no evidence that there was more to the contact between juror and the prosecutor than what was set out above.  Mr. Salter voluntarily disclosed the "conversation" to defense counsel even

---

[1]    On collateral review, relief for prosecutorial misconduct is appropriate when the conduct renders the trial so fundamentally unfair that the resulting conviction is a denial of due process.  *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991), citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).

though it is unlikely anyone would have ever known of the conversation without his disclosure.  Mr. Salter is an officer of the court and it was his duty to the court that compelled him to notify the court of the contact.  Under the factual circumstances, a mistrial, whether made on motion of defense counsel or *sua sponte*, would not have been warranted.

V.     Whether trial counsel was ineffective for not requiring the government to prove that
       the cocaine for which Hall was sentenced  was crack v. cocaine hydrochloride

The United States Supreme Court has established a national standard for judging the effectiveness of criminal defense counsel.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  *Strickland v. Washington,* 466 U.S. 668 (1984).  The Court elaborated:

> [F]irst, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendants of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

Ineffectiveness of counsel occurs only when the attorney's performance fell below an objective standard of reasonableness and, further, that but for the attorney's failure, the result of the proceeding would probably have been different.  *Chadwick v. Green*, 740 F.2d 897 (11th Cir. 1984).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland, supra*, 466 U.S. at 690.  There is a strong presumption that trial counsel's conduct is the result of trial

strategy and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Sinclair v. Wainwright,* 814 F.2d 1516 (11th Cir. 1987), *citing Strickland v. Washington, supra* at 690.

Hall argues that he "should have been sentenced under the cocaine hydrochloride sentencing guidelines" (doc. #72, p.12) rather than for crack which is "usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." (Doc. #72, p.13).

Hall argues that the confidential informants stated that he was to be in possession of cocaine hydrochloride and because there was "no showing" that the cocaine was anything other than hydrochloride he should not have been sentenced for possession of crack cocaine. Hall relies upon *United States v. Munoz-Realpe*, 21 F.3d 375 (11th Cir. 1994) in support of his assertion that he should have been sentenced for cocaine hydrochloride rather than crack. *Munoz-Realpe* is distinguishable from Hall's case because it involved cocaine hydrochloride in liquid form and the substance would have required further processing to be used as crack cocaine. Here, the evidence was clear that the cocaine was in rock form and required no additional processing. It was crack cocaine.

Sgt. Richard J. Smith, of the Anniston Police Department, testified that a confidential informant advised him that Hall "would be bringing back with him some crack cocaine, in excess of an ounce." (R-185-86, 189). There was a lab analysis performed of the substance at issue. The toxicologist report of the drugs was admitted into evidence at trial as Government's Exhibit Number 5. (R-213-14). According to the trial transcript, Government's Exhibit Number 3 "is the drugs themselves as analyzed by the DEA lab and which is the 50.2 grams of crack cocaine analyzed by the lab, which Government Exhibit Number 5 is a part of."

10

Hall's defense was that the drugs did not belong to him.  The lab report stated that the substance was crack cocaine.  Examining the toxicologist would not have been consistent with his defense.  Further, Hall cannot show that but for counsel's stipulation to the report the result–either the verdict or the sentencing–would probably have been different.

Further, the government was not required to prove that the substance contained sodium bicarbonate.  The commentary to U.S.S.G. § 2D1.1(c), Note(D) states:

> (D) "Cocaine base," for the purposes of this guideline, means "crack." "Crack" is the street name for a form of cocaine base, <u>usually</u> prepared by processing cocaine hydrochloride and sodium bicarbonate, and <u>usually</u> appearing in a lumpy, rocklike form.

(Emphasis added).

In *United States v. Jones*, 159 F.3d 969, 982-83 (6th Cir. 1998) the court recognized:

> The definition, through the use of the word "usually," serves merely to illustrate a common method of conversion.  See *United States v. Abdul*, 122 F.3d 477, 479 (7th Cir.), *cert. denied,* ___ U.S. ___, 118 S.Ct. 643, 139 L.Ed.2d 621 (1997).  If we were to disregard the qualifying term "usually," crack dealers could avoid the penalties for distribution of crack simply by finding some substitute for sodium bicarbonate in production, or by crushing the rocks so that the final product resembles powder.  Although crack might generally be produced using sodium bicarbonate production via sodium bicarbonate is not the exclusive preparation method recognized for purposes of § 2D1.1.  We conclude that the qualifer "usually" in the phrase "usually prepared ... with sodium bicarbonate" is an acknowledgment that other methods of crack preparation exist and that not all forms of "cocaine base" need contain sodium bicarbonate to qualify as crack for sentencing purposes; the Commission's reference to sodium bicarbonate is merely illustrative.  Accordingly, the presence of sodium bicarbonate is not a necessary prerequisite to a district court's factual determination that cocaine base is crack.  *See Abdul*, 122 F.3d at 479; *United States v. Stewart*, 122 F.3d 625, 627 (8th Cir. 1997).

Whether a particular substance is crack cocaine is a question of fact to be determined by the district court.  *Edwards v. United States*, 523 U.S. 511 (1998).  The Court of Appeals for the Eleventh Circuit has recognized that the cocaine base "and its distinct physical forms, such as coca paste and crack cocaine are chemically indistinguishable."  *United States v. Sloan*, 97 F.3d 1378, 1382 (11th Cir. 1996), *cert. denied,* 520 U.S. 1277 (1997).  The Eleventh Circuit has also recognized that crack cocaine is sufficiently physically distinguishable to allow persons to confirm that they have distributed it.  *Sloan*, 97 F.3d 1383, n.8.  *See also United States v. Brown*, 156 F.3d 813, 816 (8th Cir. 1998) ("among the most knowledgeable experts on crack are those who regularly smoke it or sell it."); *United States v. Robinson*, 144 F.3d 104 (1st Cir. 1998).  Because the court is satisfied that the government sufficiently proved that the substance was crack cocaine, Hall cannot show prejudice for counsel's alleged deficient performance.

VI.     Whether trial counsel was ineffective for failing to object to
        Ms. Heath's continued participation in Hall's trial

Ms. Heath was allowed to remain on the jury because it appeared that she probably did not remember Mrs. Hall and Ms. Kirksey.  Hall's speculative allegations that Ms. Heath was antagonistic toward Ms. Kirksey are not grounds for relief.  Based on the testimony of Mrs. Hall and Ms. Kirksey the court concludes that counsel was not ineffective in allegedly failing to object to Ms. Heath's continued participation on the jury, particularly as the jury had been sworn.

VII.    Whether trial counsel was ineffective for failing to call
        witnesses who could have testified that Ms. Heath knew
        Mrs. Hall and that Mrs. Hall had been to the home of Ms. Heath

Hall alleges that counsel knew Alfred Munford was prepared to testify that he was an ex-boyfriend of Mrs. Hall and "had escorted Mrs. Hall along with Ms. Heath's boyfriend, to the home

of Ms. Marie Heath on several occasions." (Petition, p. 31).   In his reply, Hall states that he told counsel before the trial was completed that Alfred Munford had escorted Mrs. Hall to Ms. Heath's home.  (Doc. #72, p.32).   Informing counsel that "prior to completion of the trial" was simply too late.  He further alleges that counsel was aware that James Munford was prepared to testify that he was the bookkeeper at the Elks Lodge where both Mrs. Hall and Ms. Heath were members and "that he knew they both knew each other."  (Petition, p. 31).   Mrs. Hall did not testify at trial so whether Ms. Heath knew her or not is irrelevant.  Hall has not shown prejudice.

VIII.   Whether trial counsel was ineffective for failing to file a motion for
        mistrial based on the communication between the juror and the prosecutor

Counsel did not, contrary to Hall's assertion otherwise, act as "second prosecutor against his client" with respect to this incident.  The details of the encounter have been set out above.  As previously concluded, a mistrial would not have been warranted; therefore, Hall cannot show either deficient performance of counsel nor prejudice for not filing a motion for mistrial.

IX.   Whether trial counsel was ineffective for failing to request that the jury
      make an individual and factual finding as to whether Hall perjured
      himself at trial, independent of their guilty verdict against Hall
      and for failing to request detailed findings by the court at sentencing

Hall alleges that due to this error, his sentence was erroneously enhanced for perjury.  At sentencing, the judge stated:

> ... Here is an individual who testified directly contrary to the other evidence, and directly contrary to the verdict of the jury.  If the jury had believed him, the jury could not have convicted him.  The jury necessarily found that he was being untruthful.
>
> I make no judgment about it.  I'm simply telling you that the jury necessarily found that he wasn't telling the truth.  I respect the jury finding.  And based upon that finding, I find that he committed perjury when he testified.

Now, perjury, in its loose sense – whether you could charge him with perjury and convict him of it is a different matter. The standard of proof here is preponderance of the evidence, not beyond a reasonable doubt.

Had the jury believed Mr. Hall, he wouldn't be standing here today. They would have turned him loose and he would be back in Anniston perhaps facing the same charges in state court, but he wouldn't be in this court.

I simply cannot, consistent with the way I have treated other defendants, wink at that and let it go. I can't say – now, I know that Mr. Hall has convinced Mr. Ritchey and perhaps himself – only Mr. Hall knows with certainty whether he was telling the truth or whether he was being untruthful. The jury found him as untruthful. Of necessity, they found that he was untruthful.

Mr. Hall knows whether he is guilty or not guilty. He is not unusual in standing there and denying it. Ninety-five or more percent of the people I see here deny that they're guilty – at least until they plead guilty – and some of them want to deny it even when they plead guilty.

But the fact is that we are faced – we are in a situation which the jury found that the defendant was untruthful, had to find that he was untruthful, and I'm not prepared to overlook that. It's just that simple.

(R-430-31).

The underlying claim (the court's enhancement for obstruction of justice for committing perjury at trial) was raised on direct appeal. The Eleventh Circuit held:

The district court did not err by enhancing Hall's sentence for his obstruction of justice in committing perjury at trial. Although the district court did not make detailed findings of perjury, the court stated that Hall testified contrary to the evidence at trial and the record supports that general finding. If Hall wanted detailed findings at sentencing, he was obligated to request those findings.

14

The court implicitly found that Hall perjured himself when he denied that the drugs were his. The court could not ask the jury to determine as part of its verdict whether Hall perjured himself as the jury could have taken that as an indication that the judge believed Hall to have perjured himself. Hall has not shown that had counsel requested findings with regard to perjury at trial or sentencing, the result–either the verdict or the sentence–would probably have been different.

X.    Trial counsel was ineffective for failing to argue at the end of Hall's trial and on direct appeal that the government failed to produce sufficient evidence to convict Hall

This claim is factually without merit. At the completion of all of the evidence, defense counsel requested "directed verdict in favor of Hall based upon the evidence presented." (R-357). In Hall's recitation of the lack of evidence against him, he failed to mention the fact that when he and Ms. Kirksey were questioned, after being advised of their *Miranda* rights, that he said the drugs belonged to him:

> Q:    Okay.  You testified as to having advised the two individuals of their *Miranda* Warnings?
>
> A:    Yes, sir.  That's right.
>
>                                   . . . .
>
> Q:    Now, all this was videotaped?
>
> A:    Yes, sir, it was.
>
> Q:    Okay.  What, if anything, did they say to you?
>
> A:    After – after reading the rights to them, I just asked if either of them wanted to make a statement or make any statements about the drugs that we had found inside the car. And Mr. Hall spoke up and said that the drugs belonged to him, and that Ms. Kirksey had nothing to do with the drugs.
>
> Q:    All right.  What else was said?

15

A:    There was a period of a couple of minutes where I talked to him about the drugs, how he came to – how he came to possess the drugs; where he had gotten them.

He told me that he had bought the drugs in Atlanta at the airport from a person, that he bought – actually purchased the drugs outside the airport in the parking lot before Ms. Kirksey had gotten there.  He said that he did not know the guy.

He said that he didn't smoke crack, so he – I don't remember if he said he paid a guy - he says in the interview that he got a person to test the drugs to see if it was any good.

. . . .

Q:    Okay.  What happened after that?  Did Ms. Kirksey say anything?

A:    I asked Ms. Kirksey if she had anything to do with it, and she denied any – any knowledge of the drugs, or that she had anything at all to do with the drugs.

(R-118-19.  See also, R-149).

In any event, Hall cannot show deficient performance since counsel requested a "directed verdict"

in favor of Hall.

XI.    Whether trial counsel was ineffective by advising the jury that Hall had previously
        been convicted of murder when this murder had nothing to do with Hall's drug case

In opening statement, defense counsel told the jury:

In allowing Mr. Hall to take the stand, I want to tell you now that it will come out that he has been involved with the law on one occasion from the standpoint of being convicted of a felony.  He was charged, I think with murder, but convicted of manslaughter, involving the shooting and killing of Ms. Kirksey's brother and also the brother of her sister who was married to Mr. Hall at one time, Bessie Hall.  That the testimony will be, of course, that the killing was an accident; and for that, he received a fifteen-year term, of which he served five and a half years in the penitentiary here in Alabama in 1990, '91 to '96, somewhere in there.  And that he was at the end of that time completely given a complete bill of health, he didn't have parole or anything like that.  He was dismissed as time served.  So, he's not on parole now, and – but he did get convicted of that.

> And you need to know that, because someone who has been convicted of crimes, they can be impeached. They can say – and the Court may charge you something, I won't try to presume what the Judge will charge you – but that when people have been impeached and where they have a record, you might decide that you don't want to believe them because of that. And, of course, that's going to be your prerogative, too.

(R-100-01).

On direct examination, Hall was questioned concerning the manslaughter conviction:

Q:   ... Mr. Hall, have you ever had any serious trouble with the law before this incident?

A:   Yes.

Q:   By that, have you been – were you tried and convicted on a manslaughter charge?

A:   Yes.

Q:   And where was that?

A:   All right. It was in '90 – 1990.

Q:   Where was it?

A:   Anniston.

Q:   In Anniston. And who was the person that you were charged with killing?

A:   My brother-in-law.

Q:   That's Bessie Hall and Daphne Hall's (sic) brother?

A:   Brother. Yes.

Q:   Were you and he mad at one another, or were you friends?

A:   We was very close friends.

Q:   Close friends. Was the killing deliberate or accidental?

A:   It was – really, it was accidental by me being ignorant.

Q:     By you being what?

A:     Ignorant.

Q:     In what way?

A:     Drinking, playing.  Playing around.

Q:     Did you serve your time?

A:     Yes.

Q:     Did you receive a sentence?

A:     Yes.

Q:     How many years?

A:     They had me for murder, but they give me fifteen years for accidental manslaughter.

Q:     And how much time did you serve for that sentence?

A:     I did five years and a half, six years, at EOS.  That's end of sentence.

Q:     Were you put on parole after that?

A:     No.

Q:     Was it – never had parole?

A:     No.  I EOS, that's end of sentence.

(R-318-19).

Hall's manslaughter conviction may have been admissible under Federal Rules of Evidence,  Rule 609(a)(1).  By explaining the circumstances of the murder charge which resulted in a manslaughter conviction before the prosecution could mention it, the damage in the eyes of the jury was certainly lessened.  In any event, Hall cannot show that but for counsel advising the jury of his manslaughter conviction, the result would probably have been different.

18

XII.   Whether Congress lacked jurisdiction to enact 21 U.S.C. § 841 resulting in the
        district court's lack of subject matter jurisdiction  (raised in docs. #75 and #78)

Hall argues that Congress did not have legislative authority under the Commerce Clause  to

enact 21 U.S.C. § 841 and he cites *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131

L.Ed.2d 626 (1995) in support of his position. In *Lopez*, the Court held that the Gun-Free School

Zones Act of 1990 which made it a federal offense "for any individual knowingly to possess a firearm

at  a place that the individual knows, or has reasonable cause to believe, is a school zone" exceeded

Congress's authority under the Commerce Clause.   The Supreme Court did not hold  that Congress

does not have the authority to enact criminal laws in general  pursuant to the Commerce Clause.   In

*Lopez*, the Court stated:

> ...[W]e have identified three broad categories of activity that Congress
> may regulate under its commerce power. ...  First, Congress may
> regulate the use of the channels of interstate commerce. ...  Second,
> congress is empowered to regulated and protect the instrumentalities
> of interstate commerce, or persons or things in interstate commerce,
> even though the threat may come only from intrastate activities. ...
> Finally, Congress' commerce authority includes the power to regulate
> those activities having a substantial relation to interstate commerce,
> ... i.e., those activities that substantially affect interstate commerce, ...
>
> Within this final category, ... the proper test requires an analysis of
> whether the regulated activity "substantially affects" interstate
> commerce.

514 U.S. at 558-59.  (citations omitted).

The court then considered  18 U.S.C. § 922(q), the statute at issue in that case, in light of the above

framework.   The court concluded that § 922 did not fit within the first or second categories.  The

court  further concluded that § 922 did not fit within the third category:

> Section 922(q) is a criminal statute that by its terms has nothing to do
> with "commerce" or any sort of economic enterprise, however broadly
> one might define those terms.
>
> ....
>
> Second, § 922(q) contains no jurisdictional element which would
> ensure, through case-by-case inquiry, that the firearm possession in
> question affects interstate commerce.
>
> ....
>
> [T]o the extent that congressional findings would enable us to
> evaluate the legislative judgment that the activity in question Hall
> substantially affected interstate commerce, even though no such
> substantial effect was visible to the naked eye, they are lacking here.

514 U.S. at 561-63.

Prior to the Supreme Court case of *Lopez*, in the coincidentally named case of *United States*

*v. Lopez*, 459 F.2d 949 (5th Cir. 1972), the Fifth Circuit Court of Appeals relied upon the findings of

Congress in holding that Congress acted within its power under the Commerce Clause when it

enacted 21 U.S.C. § § 841(a)(1) and 846:

> As the basis for the exercise of its power under the Commerce Clause
> to regulate certain activities in controlled substances, Congress made
> certain findings and declarations which are set forth in § 101 of Title
> II of the Act, 21 U.S.C. § 801. Principal among these were the
> findings that intrastate incidents of the traffic in controlled substances,
> such as manufacture, local distribution and possession, had a
> substantial and direct effect on interstate commerce; that such
> intrastate incidents of the traffic in controlled substances swelled the
> interstate traffic in such substances; that it was impossible to
> distinguish between substances manufactured and distributed intrastate
> from those manufactured and distributed interstate and, therefore, it
> was not feasible to distinguish between such substances in terms of
> controls; and that control of the intrastate incidents of traffic in
> controlled substances was essential to the control of interstate
> incidents of that traffic. Obviously, there was a rational basis for these

20

findings because they stemmed from statistical reports and extensive testimony as to the extent of the drug traffic and the unauthorized use of drugs. Moreover, Congress had a rational basis for finding that controlled substances manufactured and distributed on an intrastate basis could not be differentiated from those manufactured and distributed on an interstate basis.

A large percentage of controlled substances, especially those held or manufactured for illicit sale, are unlabeled, thereby making a determination of their source of origin extremely difficult or impossible. The form in which they are held or consumed adds to the difficulty or impossibility of this determination.

From such a finding, Congress could reasonably assume that an attempt to separate intrastate activities in controlled substances from those which were conducted on an interstate basis would be a futile exercise substantially interfering with its power to regulate interstate commerce in these substances; a power upon which any attempt to end or alleviate the drug abuse problem would necessarily be based.

Past attempts to regulate interstate commerce in controlled substances had failed because of the difficulty or impossibility of determining the substance's source of origin. To make another attempt at controlling interstate commerce in controlled substances without regulating both intrastate and interstate activities in these substances would be ineffective.

459 F.2d at 952-53.

See also, *United States v. Weinrich*, 586 F.2d 481, 498 (5th Cir. 1978) (21 U.S.C. § 841(a)(1) is constitutional even though it does not require interstate nexus as element of conviction); *United States v. Bernard*, 47 F.3d 1101, 1102 (11th Cir. 1995) ("Possession and sale of illegal drugs impacts interstate commerce.")

Since the *Lopez* Supreme Court decision, all of the circuits addressing Commerce Clause challenges to 21 U.S.C § 841 have upheld it. See *United States v. Brown*, 276 F.3d 211 (6th Cir.2002), *cert. denied*, 535 U.S. 1079 (2002); *United States v. Westbrook*, 125 F.3d 996, 1009 (7th

21

Cir. 1997), *cert. denied*, 522 U.S. 1036 (1997); *United States v. Edwards*, 98 F.3d 1364, 1369 (D.C. Cir. 1996), *cert. denied*, 520 U.S. 1170 (1997); *United States v. Orozco*, 98 F.3d 105, 107 (3d Cir. 1996); *United States v. Kim*, 94 F.3d 1247, 1249-50 (9th Cir. 1996); *United States v. Bell*, 90 F.3d 318, 321 (8th Cir. 1996); *United States v. Lerebours*, 87 F.3d 582, 584-85 (1st Cir. 1996), *cert. denied* 519 U.S. 1060 (1997); *United States v. Genao*, 79 F.3d 1333, 1336 (2d Cir. 1996); *United States v. Wacker*, 72 F.3d 1453, 1475 (10th Cir. 1995); *United States v. Clark*, 67 F.3d 1154, 1166 (5th Cir. 1995), *vacated on other grounds*, 519 U.S. 802 (1996); *United States v. Leshuk*, 65 F.3d 1105, 1111-12 (4th Cir. 1995).   Although the Eleventh Circuit has not  ruled on this particular issue, the court is confident that when it does, there will be unanimity among the circuits.

XIII.   Whether Hall's sentence to 235 months under the Sentencing Guidelines is unconstitutional based on *Blakely v. Washington*, 542 U.S. ____, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *United States v. Booker*, _____U.S. ____, 125 S.Ct. 738, _____L.Ed.2d ____ (2005)

The Eleventh Circuit Court of Appeals recently held that *Blakely* and *Booker* do not apply retroactively to § 2255 cases on collateral review.  *Varela v. United States*, ___ F.3d ___ (11th Cir., Feb. 17, 2005).  Hall's conviction became final on March 20, 2000 when the United States Supreme Court denied the petition for writ of certiorari, well before both *Blakely* and *Booker* and even before the decision in the precursor opinion of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) which was decided on June 26, 2000.  Because *Booker* is not retroactive the court need not address whether the 235 month sentence violates *Apprendi* and *Blakely*.  *Varela*, n.2.

After consideration of the petition, the positions of the parties and the applicable law, Mr. Hall's motion for relief pursuant to 28 U.S.C. § 2255 is due to be and the same is hereby DENIED in its entirety.

Done this <u>30th</u> day of <u>March 2005</u>.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153